# ORIGINAL

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PAUL ROBERSON,                    :
      Petitioner          :        No. 1:CV-01-1235
                 :
          v.                :        (Judge Rambo)
                 :
IMMIGRATION & NATURALIZATION  :
SERVICE,                          :
      Respondent          :

FILED
HARRISBURG
JUL 30 2001
MARY E. D'ANDREA, CLERK
Per_____
DEPUTY CLERK

EXHIBITS IN SUPPORT OF
RESPONSE TO HABEAS CORPUS PETITION

MARTIN C. CARLSON
United States Attorney

MARK E. MORRISON
Assistant U.S. Attorney
228 Walnut Street, 2nd Floor
P.O. Box 11754
Harrisburg, PA 17108-1754
717/221-4482

Date:  July 30, 2001

# Exhibit 1

# NEW YORK CITY DEPARTMENT OF PROBATION
## PRE-SENTENCE INVESTIGATION

99R5536

Probation Case # KS99-03580   Indictment/ Docket#  9576-98   Supreme Court   Kings County

Investigating P.O.  L. Bowe   NYSID #: 8834844Q   FBI #: 988009FB4

## A. PERSONAL INFORMATION

| Name (Last, First, Middle, Maiden) | AKA |
|---|---|
| Roberson, Paul | |

| Present Address (Indicate Apt. # or P.H.) | Telephone # |
|---|---|
| 172 47th St, Bklyn, N.Y. 11203 | (718) 856-8643 |

| Birthdate | Place of Birth | Citizenship |
|---|---|---|
| 9/9/77 | Haiti | Haiti |

| Marital Status | Lives With | Sex | Race | Ethnicity |
|---|---|---|---|---|
| Single | Family | Male | Black | NH |

| Height | Weight | I.D. Marks | Social Security # |
|---|---|---|---|
| 5'7" | 145 | None | 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 |

## B. PRESENT COURT PROCEEDING

| Judge/Part: JOSEPH SILVERMAN / 32 | Assistant District Attorney: Appel |
|---|---|

| Counsel's Name/Address: J. Monteleone, John, 32 Court St, Bklyn, N.Y. 11201 | Defendant's Status at Interview: Custody X   Liberty |
|---|---|

| Offense Date: | Arrest Date: | Conviction Date: | Scheduled Sentence Date: |
|---|---|---|---|
| 9/17/98 | 9/17/98 | 8/11/99 | 8/23/99 |

Indictment/Information Charges:  Gang Assault 1°, Gang Assault 2°, Assault 1°, Assault 2° (2 Counts), Assault 3°, C.P.W. 4°, Menacing 2°

Final Charge (Plea): Assault 2°

| Co-Defendant(s) Name(s) CHARLES RASAKO | | Co-Defendant(s) NYSID # 9013254H | | Co-Defendant(s) Case Status Plead Guilty 8/17/99 Assault 1° Adj to 9/23/99 for sentencing |
|---|---|---|---|---|
| | | | | |

## C. LEGAL INFORMATION

| | | |
|---|---|---|
| Other Pending Charges/Warrants | X No ___ Yes | See Attached Criminal History |
| Prior Convictions | ___ Fel  X Misd | |
| Predicate Felon? | X No ___ Yes | See Attached Criminal History |
| Current Probation/Parole Supervision | ___ No  X Yes | |
| Prior Probation/Parole Violation | X No ___ Yes If Yes  ___ Pending ___ Completed | |
| Prior History of Absconding/Escape from Institution/Court | X No ___ Yes | |
| Prior History of Bench Warrant | X No ___ Yes | |
| History of Violence/Weapons Use | X No ___ Yes | |

| Youthful Offender | | Juvenile Offender  ___ Yes  X No |
|---|---|---|
| Eligible | ___ Yes  X No | |
| Required | ___ Yes  X No | Prior P.S.I. Attached  ___ Yes  X No |
| Birthdate Verified | ___ Yes  X No | |
| Y.O. Recommended | ___ Yes  X No | |

Disposition:                                      Date:

BERSON, PAUL.                    2                    Case Number KS99-03580

## D. PRESENT OFFENSE

X  Defendant was interviewed on: 8/11/99

_  Defendant was not interviewed.

_  failure of corrections to produce

_  defendant refused to be interviewed

_  defendant failed to appear for interview

## Description:

On 9/17/98, at approximately 4 p.m., at the Atlantic Avenue and Flatbush Avenue subway, the defendant and co-defendant Rasako Charles were waiting on the platform when they observed the complainant and friends. The defendant, co-defendant, and 3 unapprehended individuals began to chase the complainant and his friends. The complainant was caught, and he was struck over the head with a cane. He began to run away, and co-defendant Rasako removed a knife and stabbed him in the back.

The complainant's injuries consisted of a puncture wound 1 inch from his right lung, 2 or 3 broken ribs and a laceration to the head. He received surgery at St. Vincent's Hospital.

The defendant and co-defendant were arrested by P.O. Quantanilla, Shield # 10335, of 88 Precinct. A kitchen knife with a 5 inch blade was recovered from co-defendant Rasako.

### Status of Co-defendant:

Co-defendant Rasako Charles, NYSID # 9013254H pleaded guilty on 8/17/99 to Assault 1°, and is scheduled for sentencing on 9/23/99.

### Summary of Offender's Statement:

The defendant admits his guilt to the instant offense. He explained that he did not stab the victim, but he kicked and punched him. He also stated he feels remorse about the incident, and was sure it was not gang related. He also admitted his friends are involved in gangs, but he denied any gang affiliation.

### Victim Impact Statement:

The complainant Kevin Chandler was contacted on 8/13/99. He was too emotional to describe the incident. He explained he has nightmares some nights, and refuses to travel some days. The complainant's mother also expressed her concerns. She stated she is happy her son is alive due to his severe condition. The complainant also suffers from back pain. She also stated, she hopes the defendants always remember what they did to a person. The complainant stated he does not want to decide the defendant's sentence and would leave it to the court's discretion.

| BERSON, PAUL | 2 A | Case Number: KS99-03580 |

## D. PRESENT OFFENSE (Continued)

### Analysis of Offense and Legal History:

The defendant is appearing before the court on his third adult arrest dating back to 1998. He has one prior conviction for Petit Larceny wherein he was sentenced to 10 days in jail and 3 years probation on 7/27/98. The defendant was on probation when he committed the present offense, and as a result his probation was violated, and he was re-sentenced to 90 days.

The defendant also has a 1998 Disorderly Conduct conviction resulting in a conditional discharge and community service. It should be noted the defendant has also incurred bench warrants in his criminal history.

L.                                    3                        Case Number KS99-03580

## E. SOCIAL HISTORY SUMMARY

s:

|  | Relationship | Address | Telephone |
|---|---|---|---|
|  | Mother | Haiti |  |
|  | Father | Case address |  |
|  | Sister (14) | Case address |  |
|  | Sister (6) | Case address |  |
|  | Brother (26) | Florida |  |
|  | Stepmother | Case address |  |

rs Currently Incarcerated in State Correctional Facility: _X_ No _ Yes

ly Member(s):   1.              2.

tution(s):   1.              2.

ther or Family Member

|  | Relationship | Address | Telephone |
|---|---|---|---|
|  |  |  |  |

| mpleted: | Tilden H.S. 12th grade | Name of Current School: | Two Bridges H.S. |
|---|---|---|---|
| d: | _X_ No _ Yes | Address: | Co-op Program 2 years |
| mentally Disabled: | _X_ No _ Yes |  |  |

nary Language: _____
icates in English:        _ No _ Yes

e of Defendant Determined by:   (Check all that apply)

| _X_ Defendant's Statement | _X_ Prior Probation Report |
|---|---|
| _ Birth Certificate | _X_ Court Papers |
| _ CJA Report | _X_ NYSID |
| _ Family Member | _ Other (Describe) |

pyment:

| rked | Length of Employment | Position/Salary |
|---|---|---|
|  | Deft. worked in Florida |  |
| ame | Employer Address |  |

| 4 | Case Number KS9 _ 03580 |

| : | Position: |
| --- | --- |
|  |  |

o  _ Yes   Service Branch:  _____

_ Other          Year of Discharge:

X Good    _ Problems

ns, i.e. diagnosis if known, current medication or need for medication.  Is medical assessment indicated?

|  | **Drugs** | **Alcohol** |
| --- | --- | --- |
|  | _ Yes  X No | _ Yes  X No |
|  | Marijuana (blunts) | Occasionally-alcohol |
|  |  |  |
|  | _ Yes  X No | _ Yes  X No |
|  | 16 | beer |
| ance |  |  |
| ffense | _ Yes  X No | Yes  X No |
| ;Res) |  |  |
| ent | _ Yes  X No | _ Yes  X No |
| ;Res) |  |  |
| drug of choice. |  |  |

| -... |  | X No  _ Yes |
| --- | --- | --- |
|  |  |  |
| l/Program: |  | X No  _ Yes |
| st ation: |  | X No  _ Yes |
|  |  | X No  _ Yes |
| eats |  | X No  _ Yes |
|  |  | X No  _ Yes |
| ation pital: |  | X No  _ Yes |

RSON, PAUL                          5                    Case Number KS99-03580

## F. EVALUATIVE ANALYSIS

18 year old defendant is before the court for Assault 2° which represents his 3rd adult conviction. The defendant a short, but potentially violent criminal history and it appears he may benefit from anger management counseling.

defendant is a Haitian immigrant, who claims to be a resident alien. He is a high school dropout, and lives with his er, stepmother and siblings in a private house. The defendant has no work history.

defendant admits he smokes marijuana on a daily basis, and drinks alcohol occasionally. The defendant also ears in need of drug counseling.

REPARED BY:_____        REVIEWED BY: _C Buscemi 8-20-99_
              Leah Bowe, P.O.          Date                Catherine Buscemi, S.P.O.          Date
                                            SUBMITTED BY:_____
                                                Magda Rebhun, Branch Chief          Date

ni
0/99

# Exhibit 2

# NEW YORK STATE SUPREME COURT

Sentence and Order of Commitment

**Kings County   Part** _32_

S.C.I. ☐

**Indict . No.** _9576/98_

99R5536

**Date** _8-23-99_

**Hon.** _J. Siuvonian J_

Justice

**Court Reporter** _I. STUCKEY_

| The People of the State of New York -vs- |
|---|
| *Paul Roberson* |
| **Defendant** |

| | | |
|---|---|---|
| M | 9/9/77 | 88348440Q |
| **Sex** | **D.O.B.** | **NYSID** |

**The Defendant having been**

☐ Convicted of the Crime/s of:

☐ Adjudicated a Youthful Offender

**It is the Judgment of the Court that the Defendant be and hereby is sentenced to:**

☐ An Indeterminate Term of   ☐ A Definite Term of   ☐ A Determinate Term of

imprisonment of:

| CRIME | No. of Counts | Counts are to run Concurr. Consecutive | | Minimum Term (Years) | Maximum Term (Years) | (Specify: days, Mos. or Year) |
|---|---|---|---|---|---|---|
| 1 *Assault 2°* | ___ | [ ] | [ ] | _____ | _____ | *2 years* |
| 2 *(120.05-1)* | ___ | [ ] | [ ] | _____ | _____ | |
| 3 _____ | ___ | [ ] | [ ] | _____ | _____ | |
| 4 _____ | ___ | [ ] | [ ] | _____ | _____ | |
| 5 _____ | ___ | [ ] | [ ] | _____ | _____ | |

**The sentence on all Crimes is to run CONCURRENTLY unless otherwise indicated:**

Crimes number _____ **shall run CONSECUTIVELY** .

☐ Court directs that the sentence be executed as a sentence of Parole Supervision

☐ Defendant designated a SEX OFFENDER

**RECEIVED**

SEP 1 0 1999

ULSTER C.F.

**As a:** ☐ Second Felony Offender   ☐ Second Violent Felony Offender   ☐ Persistent Felony Offender

☐ Persistent Violent Felony Offender       ☐ Probation Violator

☐ JUVENILE OFFENDER- Date of crime _____ Defendant must be housed in a secure facility of the NY State Division for Youth

**And** ☐ Pay a fine of $_____or serve a term of _____days   from inmate funds.

☐ Pay  a Mandatory  Surcharge of $ _150_   from inmate funds.   *JoATC*

☐ Pay a Crime Victim Assistance Fee of $ _5_   from inmate funds.

**This sentence shall run:** CONCURRENTLY with _____

CONSECUTIVELY to _____

The defendant is hereby committed to the custody of the New York City Department of Correction to be delivered to and incarcerated in the appropriate correctional facility until released according to law.

**REMARKS:** _Physical force_

_____

**A true extract of the minutes.**

**BY ORDER OF THE COURT:** _____ **Court Clerk.**

☐ Copy forwarded to Board of Election, County of _____ , N.Y.
Defendant's Address

| Commit. & Prob. Report Rec'd by N.Y.C. Dept of Correction- |
|---|
| Correction Officer |
| # _12188_ |
| **Shield No.** |

| Citation | Found Document | Rank 1 of 1 | Database |
|---|---|---|---|
| 28 USCA S 1402 | | | USCA |
| 28 U.S.C.A. § 1402 | | | |

### UNITED STATES CODE ANNOTATED
### TITLE 28. JUDICIARY AND JUDICIAL PROCEDURE
### PART IV--JURISDICTION AND VENUE
### CHAPTER 87--DISTRICT COURTS; VENUE

Copr. © West Group 2001.  No claim to Orig. U.S. Govt. Works.

Current through P.L. 107-11, approved 5-28-01

§ 1402. United States as defendant

 (a) Any civil action in a district court against the United States under subsection (a) of section 1346 of this title may be prosecuted only:

 (1) Except as provided in paragraph (2), in the judicial district where the plaintiff resides;

 (2) In the case of a civil action by a corporation under paragraph (1) of subsection (a) of section 1346, in the judicial district in which is located the principal place of business or principal office or agency of the corporation;  or if it has no principal place of business or principal office or agency in any judicial district (A) in the judicial district in which is  located the office to which was made the return of the tax in respect of which the claim is made, or (B) if no return was made, in the judicial district in which lies the District of Columbia.  Notwithstanding the foregoing provisions of this paragraph a district court, for the convenience of the parties and witnesses, in the interest of justice, may transfer any such action to any other district or division.

 (b) Any civil action on a tort claim against the United States under subsection (b) of section 1346 of this title may be prosecuted only in the judicial district where the plaintiff resides or wherein the act or omission complained of occurred.

 (c) Any civil action against the United States under subsection (e) of section 1346 of this title may be prosecuted only in the judicial district where the property is situated at the time of levy, or if no levy is made, in the judicial district in which the event occurred which gave rise to the cause of action.

 (d) Any civil action under section 2409a to quiet title to an estate or interest in real property in which an interest is claimed by the United States shall be brought in the district court of the district where the property is located or, if located in different districts, in any of such districts.

CREDIT(S)

1993 Main Volume

(June 25, 1948, c. 646, 62 Stat. 937;  Sept. 2, 1958, Pub.L. 85-920, 72 Stat. 1770;  Nov. 2, 1966, Pub.L. 89-719, Title II, § 202(b), 80 Stat. 1149;  Oct. 25, 1972, Pub.L. 92-562, § 2, 86 Stat. 1176;  Apr. 2, 1982, Pub.L. 97-164, Title I, § 131, 96 Stat. 39.)

<General Materials (GM) - References, Annotations, or Tables>

Certified from ⟶ ecord
Date ___3/61___
Mary E. D'Andrea, Clerk
Per _____
Deputy Clerk

**ORIGINAL FILED**

MAR 29 1995

WILLIAM T. WALSH, CLERK

UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

95CV1478(JBS)

DOUGLAS GREGG SANSBURY,          :
                                 :
          Plaintiff              :      No. 4:CV-95-0071
                                 :
     vs.                         :      (Complaint Filed 1/18/95)
                                 :
UNITED STATES OF AMERICA,        :      (Judge Muir)
                                 :
          Defendant              :

**ORDER**

March   24, 1995

FILED
WILLIAMSPORT, PA

MAR 24 1995

MARY E. D'ANDREA, CLERK
PER _____
        DEPUTY CLERK

THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:

Federal inmate Douglas Gregg Sansbury filed this action
under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-2680
("FTCA"). Sansbury alleges officials at the Federal Correctional
Institution, Fairton, New Jersey lost items of his personal
property while he was assigned to a segregated housing unit in
that facility in November, 1993.

This matter comes before the court for consideration of
defendant's motion to transfer venue under 28 U.S.C. § 1404(a).
For the following reasons, the motion will be granted, and this
case will be transferred to the United States District Court for
the District of New Jersey.

Sansbury was an inmate at the Allenwood penitentiary in
White Deer, Pennsylvania from February 18, 1994 until November 7,

AO 72A
(Rev. 8/82)

1994.  While it appears he prepared the pro se complaint in this case while he was incarcerated at Allenwood, the complaint was not filed until January 18, 1995, more than two months after Sansbury's transfer from Allenwood to the Schuylkill Federal Correctional Institution, Minersville, Pennsylvania.  Allenwood is located in this judicial district, while Schuylkill is in the United States District Court for the Eastern District of Pennsylvania.  Fairton, the site of Sansbury's alleged property loss, is located in the District of New Jersey.

Title 28 U.S.C. § 1404(a) provides that "[f]or the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."[1] Under the circumstances, the District of New Jersey is a more convenient forum to consider this complaint.

First, as the act or omission of which Sansbury complains occurred in New Jersey, the law of the State of New Jersey applies in this case.  28 U.S.C. § 2672.  The New Jersey district courts are eminently more familiar with the laws and practices of New Jersey.  See Dicken vs. United States, 862 F.Supp. 91, 93-94

---

1.  Venue for actions brought under the FTCA is governed by 28 U.S.C. § 1391(e).  Section 1391(e) provides that venue is proper in any judicial district: (1) where a defendant resides; (2) in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or (3) where the plaintiff resides if no real property is involved in the action.  The District of New Jersey is a proper venue for this case, as the events giving rise to Sansbury's FTCA claim occurred there.

2

(D.Md. 1994).  Furthermore, the New Jersey courts have greater

ease of access to sources of proof, and compulsory process for the

attendance of unwilling witnesses.  Sansbury has not opposed the

defendants' motion, a factor that also weighs in favor of a

transfer.  Finally, in the event that a hearing becomes necessary,

any expense and risk involved in transporting Sansbury from

Schuylkill to New Jersey would be far less that the hardship of

transporting all the necessary records and witnesses from both

Schuylkill (the plaintiff) and Fairton (the New Jersey prison

officials) to the Middle District of Pennsylvania.

> NOW, IT IS ORDERED THAT:
>
> 1.   The defendant's motion to transfer is granted.
>
> 2.   The Clerk of Court is directed to transfer
>      this action to the United States District Court for
>      the District of New Jersey.
>
> 3.   The Clerk of Court is directed to close this case.
>
> 4.   Any appeal from this decision is frivolous, not taken
>      in good faith, and lacking probable cause.

MUIR
United States District Judge

MM:jb

Exhibit 3

**In removal proceedings under Section 240 of the Immigration and Nationality Act**

|  |  |
|---|---|
| File No: | A 41 583 833 |
| DIN#: | 99R5536 |
| EPR: | May 27, 2000 |

In the Matter of:

| Respondent: | PAUL | Roberson |
|---|---|---|
| A/K/A | | |

currently residing at:

| Marcy | Facility | Box 5000 |
|---|---|---|
| | | Marcy, NY        13403 |

(Number, street, city, state and ZIP code)                    (Area code and phone number)

[  ]   1. You are an arriving alien.
[  ]   2. You are an alien present in the United States who has not been admitted or paroled.
[X]   3. You have been admitted to the United States, but are deportable for the reasons stated below.

The Service alleges that you:

## SEE ATTACHED I-831 FOR ALLEGATIONS

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law:

## SEE ATTACHED I-831 FOR CHARGES

[  ]      This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution.

[  ]      Section 235(b)(1) order was vacated pursuant to:        [  ] 8 CFR 208.30(f)(2)        [  ] 8 CFR 235.3(b)(5)(iv)

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at:

| Executive Office of Immigration Review | 201 Varick Street |
|---|---|
| Immigration Court | New York, NY    10008 |

(Complete Address of Immigration Court, Including Room Number, if any)

on          date, time and place to be set          to show why you should not be removed from the United
    (Date)                                    (Time)

States based on the charge(s) set forth above.

Date: May 8, 2000

_____
(Signature and Title of Issuing Officer)
Institution Removal Program Director

New York, New York
(City and State)

Form I-862(Rev. 4/1/97)

Immigration and Naturalization Service          Continuation Page for Form N I A

| Alien's Name | File Number | Date |
|---|---|---|
| PAUL, Roberson | A 41 583 833 | May 8, 2000 |

## ALLEGATIONS:

1.  You are not a citizen or national of the United States;

2.  You are a native of Haiti and a citizen of Haiti;

3.  You were admitted to the United States at New York, New York on April 18, 1988 as a Lawful Permanent Resident;

4.  You were convicted of the crime of Assault in the Second Degree, in violation of Section 120.05 (1) of the New York State Penal Law, pursuant to a judgment entered on or about August 23, 1999 by the Supreme Court of the State of New York, County of Kings, under indictment number 9576-98;

5.  As a result of the aforesaid conviction for Assault in the Second Degree, you were sentenced to a term of imprisonment of at least one year.

## CHARGE:

Section 237(a)(2)(A)(iii) of the Immigration and Nationality Act (Act), as amended, in that, at any time after admission, you have been convicted of an aggravated felony as defined in Section 101(a)(43)(F) of the Act, a crime of violence ( as defined in section 16 of title 18, United States Code, but not including a purely political offense) for which the term of imprisonment at least one year.

9-27-2000
TSM

| Signature | Title |
|---|---|
| | Institutional Removal Program Director |
| | PAGE # _____ |

Form I-831 Continuation Page (Rev. 4/1/97)

* Warning: Any statement you make may be used against you in removal proceedings.

* Alien Registration: This copy of the Notice to Appear served upon you is evidence of your alien registration while you are under removal proceedings. You are required to carry it with you at all times.

* Representation: If you so choose, you may be represented in this proceeding, at no expense to the Government, by an attorney or other individual authorized and qualified to represent persons before the Executive Office for Immigration Review, pursuant to 8 CFR 3.16. Unless you so request, no Removal will be scheduled earlier than ten days from the date of this notice, to allow you sufficient time to secure counsel. A list of qualified attorneys and organizations who may be available to represent you at no cost will be provided with this Notice.

* Conduct of the Removal: At the time of your Removal, you should bring with you any affidavits or other documents which you desire to have considered in connection with your case. If any document is in a foreign language, you must bring the original and a certified English translation of the document. If you wish to have the testimony of any witnesses considered, you should arrange to have such witnesses present at the Removal.

* At your Removal you will be given the opportunity to admit or deny any or all of the allegations in the Notice to Appear and that you are inadmissible or deportable on the charges contained in the Notice to Appear. You will have an opportunity to present evidence on your own behalf, to examine any evidence presented by the Government, to object, on proper legal grounds, to the receipt of evidence and to cross examine any witnesses presented by the Government.

* You will be advised by the immigration judge before whom you appear, of any relief from removal for which you may appear eligible including the privilege of departing voluntarily. You will be given a reasonable opportunity to make any such application to the immigration judge.

* Failure to appear: You are required to provide the INS, in writing, with your full mailing address and telephone number. You must notify the Immigration Court immediately by using Form EOIR-33 whenever you change your address or telephone number during the course of this proceeding. You will be provided with a copy of this form. Notices of Removal will be mailed to this address. If you do not submit Form EOIR-33 and do not otherwise provide an address at which you may be reached during proceedings, then the Government shall not be required to provide you with written notice of your Removal. If you fail to attend the Removal at the time and place designated on this notice, or any date and time later directed by the Immigration Court, a removal order may be made by the immigration judge in your absence, and you may be arrested and detained by the INS.

## Request for Prompt Removal

To expedite a determination in my case, I request an immediate Removal. I waive my right to have a 10-day period prior to appearing before an immigration judge.

Before: _____ L. Smith INS/DEO _____

(Signature and Title of INS Officer)

(Signature of Respondent)

Date:

---

## Certificate of Service

This Notice to Appear was served on the respondent by me on _____ 26 MAY 00 _____ , in the following manner and in

(Date)

compliance with section 239(a)(1)(F) of the Act:

[ X ]    in person          [ ]    by certified mail, return receipt requested          ~~~~~~    by regular mail

[ X ]    Attached is a list of organizations and attorneys which provide free legal services.

[ ]    The alien was provided oral notice in the _____ English _____ language of the time and place of his or her

Removal and of the consequences of failure to appear as provided in section 240(b)(7) of the Act.

_Roberson, Paul_

(Signature of Respondent if Personally Served)

_L. Smith_

(Signature and Title of Officer)

Form I-862(Rev. 4/1/97)

# Exhibit 4

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
FOR THE IMMIGRATION COURT
York, Pennsylvania

File No.:    A 41 583 833                    December 21, 2000


In the Matter of            )
                            )
ROBERSON PAUL,              )        IN REMOVAL PROCEEDINGS
                            )
        Respondent          )


CHARGES:        INA Section 237(a)(2)(A)(iii)


APPLICATIONS:   Withholding under INA Section 241(b)(3),
                withholding under the Convention Against Torture,
                and deferral under the Convention Against Torture


ON BEHALF OF RESPONDENT:        ON BEHALF OF SERVICE:
Pro se                          Daryl E. Bloom, Esquire

                ORAL DECISION OF THE IMMIGRATION JUDGE

        This young man came to the United States in 1988 at the
age of 10, sponsored by his step mother, his father's U.S.
citizen wife.  He has grown up in the United States since age 10
and is now 23.  He has been convicted of disorderly conduct for
which he received a conditional discharge and of petty larceny
for which he received a 10-day sentence and three years
probation, but most importantly he was convicted of assault in

mlw

the second degree, an event that occurred when he was 21 years old on September 17, 1998, where he and five others attacked somebody for money outside the subway in New York and he and another person were caught.  Three got away.  The other person who was caught stabbed the victim and was convicted of assault in the first degree.  The respondent was not involved in stabbing the victim, but he was still involved in the assault on the victim and was given a two year sentence for assault in the second degree.  The pre-sentence report said that he was young and may benefit from anger and management counseling and it appears that he is remorseful for what he has done.

Nonetheless it makes him deportable without any right to stay in the United States based on his growing up here since age 10 and his having his family here which includes not only his father and step mother but also several aunts and uncles, and he is ineligible given the IIRAIRA of 1996 to ask to stay in the United States because he has been convicted of what was redefined in 1996 to be an aggravated felony in that a sentence of more than one year for a crime of violence made the crime "aggravated" in Congress's views.  Whereas, under the prior law the sentence had to be five years in order to constitute an "aggravated" felony.  The respondent is therefore deportable and not eligible for Section 240A(a) relief nor for a Section 212(c) waiver since it has been repealed prior to the respondent's commission of the crime that makes him deportable.

A 41 583 833                           2                    December 21, 2000

mlw

He is from Haiti, and his father apparently fled from Haiti a short time after the respondent's grandfather, i.e. his father's father was murdered by Ton-ton Macoutes. The irony in the situation is that the respondent's father had two brothers who were also members of the Ton-ton Macoutes. They appeared to stay in Haiti a little while longer but fled from the city where they worked to the countryside and eventually to the United States and apparently both are citizens, one in Miami and one in New York.

The respondent grew up in Haiti with his father's family. His father and his mother were not married when he was born, and his mother did not care for him at all when he was born and has not been part of his life since. He used to see her maybe once every six months, if that, and has not heard from her since 1996 when he talked with her one time by telephone and believed that she's in the Dominican Republic. Since his coming to the United States at age 10 he has not seen her. He grew up with father's parents and his father's sister and brothers. The parents lived in a small village called Jacques Mell, and some of his father's family lived in the capital Port-au-Prince. The respondent's father's father was a business man. He was apparently well off by Haitian standards. The respondent recalls that he drove a big car, and the respondent's father testified that he owned a business that made or prepared food and had at least some 10 or 20 employees under his charge in the small town

mlw

of Jacques Mell.   There is some confusion as to when he was killed or at least some confusion in pinpointing that time with dates on the calendar.   At one point the respondent's father said he was killed in the 1960's but it is clear that this was not correct.   The respondent's father was over 20 years old when the grandfather was killed.   That would make it at least 1972 since respondent's father was born in 1952.   It would also have been before the respondent's father's came to the United States which occurred in 1981.   So it was sometime during that nine year period.   It was also at a time when the respondent himself was alive.   He was born in 1977.   So the period is narrowed down between '77 and '81.   The respondent testified that he had memories of his grandfather and he thought that his grandfather was killed when he was about six or seven years old.   It appears that if he had memories of his grandfather the latest his grandfather could have been killed was when the respondent was three or four years old because the respondent's father came to the United States in 1981, and that was when the respondent was four years old.   His grandfather had died by that time. Therefore, the Court believes that the respondent's grandfather was killed in about 1980 or '81 shortly before the respondent's father came to the United States and the respondent himself was three or four years old.

According to the respondent's father's testimony he had two brothers who were both members of the Ton-ton Macoutes.   They

mlw

worked in the capital. They were government functionaries. Although the stereotype of them is as murderers for the Duvalier regime, it appears that they in addition served certain legitimate functions of protection of government officials and that's the job these men had according to respondent's father. They apparently became disillusioned after their own father was killed by Macoutes in around 1980 or '81. They eventually left the city and went into hiding in Jacques Mell in the countryside and eventually they both came to the United States not too long after.

The respondent's father also testified that his mother, respondent's grandmother, died of natural causes, sickness, in Haiti after respondent's father came to the United States. Therefore, it would have been sometime after 1981, and it was before the respondent himself came to the United States which was in 1988 when he was 10. So therefore sometime between the time when he was three and ten his grandmother also died. It may well be that this is who died when he was six or seven years old. The respondent's father also testified that another brother named Gaston Paul died sometime in 1991 or 1992 which would have been after both the respondent and his father came to the United States. He also died of sickness.

The respondent gave testimony himself in support of his application for withholding of deportation under Section 241(b)(3) and under the Convention Against Torture. That

A 41 583 833                    5                    December 21, 2000

mlw

testimony differed some from his father's, but the Court sees

those differences as mainly explained by the inadequate

perception of a three to six-year old and the inadequate memories

of any adult from that time period in one's life.  The rest of

what he knows about his family he has learned from people here,

and as his father testified his son really did not know much

about what had happened to the family when the events that caused

respondent's father and brothers to come to the United States

occurred.  In addition, the Court does not find in these

differences in testimony the kinds of exaggerations or consistent

exaggerations that would indicate a clear fabrication of a claim.

For instance, the respondent himself testified that as far as he

understood his grandfather was a member of the Macoutes but none

of his uncles were.  He said that he had one uncle Michelet who

was a Macoute but no others.  In reality his grandfather was not

a Macoute.  His uncle Michelet was and his other uncle Jacques

also was.  If he had a concerted plan to make his claim stronger,

he would not be testifying that his other uncles were not

involved if in fact they were.  Also when asked if he knew how

somebody was a Macoute or not he goes back to a childish way of

recognizing it and said that the Macoutes wore certain uniforms

and their uniforms were different from police uniforms.  At one

point he said that his grandfather wore a uniform, but when asked

on cross-examination whether he did, he said that he never saw

him in uniform but rather that his grandfather wore a suit.  He

A 41 583 833                    6                December 21, 2000

mlw

said that the suit had patches on the arms and when asked if the neighbors knew if his grandfather was a Macoute he said he did not know but said also that the reason everybody knew he was a Macoute because he wore a suit with a patches on his arms and drove a big car.  The Court attributes these differences to differences in perception of a three year old (his grandfather must have died at least sometime before he was four) and the recollection of those events years later without necessarily accurate reinforcement in the time being.  The basic gist of his claim is still well embedded in his mind and is consistent with the significant events testified to by his father.  Those facts include the fact that his grandfather was killed.  His grandmother and uncle are both dead.  Somebody in his family was a Macoute.  The respondent testified also during his direct examination that it is grandmother that also told him that his grandfather was a Macoute.  He also testified on direct examination that after his grandfather's funeral he went to live with his aunt Michillin (not to be confused as the Court did in hearing the testimony with his uncle whose name is Michelet which I believe is spelled Michelet) and also that he lived with another uncle called Darcis Paul, but he did not know how to spell it (the Court imagines Darcis).  In other words he did not live in the same home during his entire childhood but went "back and forth" as he says.  In cross-examination he said that he lived from ages eight to eleven with his aunt.  That clearly is a

A 41 583 833                        7                December 21, 2000

mlw

mistake as well because by time he became eleven he had been in the United States already for two months. The Court therefore does not view such inconsistencies as anything other than the result of a person trying to remember adult facts as perceived originally by a child's mind. His father's testimony was straightforward, clear, responsive, and consistent on examination and cross-examination and the respondent's testimony was not inconsistent with the general tone and the general import of his father's testimony.

Whether his life or freedom would be threatened if he returns to Haiti today is alleged to depend on two things, one the fact that his family was involved with Macoutes in the past and so there will be a certain association between him and the Macoutes and secondly that he will be returning to Haiti as somebody rejected from the United States and somebody different from most Haitians now because he has been in the United States all of his formative years from age ten on, that he looks, acts, and talks differently, and that in the ambience of violence and instability that exists in Haiti today deportees are often scapegoated as the source of crime, violence, and gang membership in Haiti whether or not that is a fact. In other words, his view is that he will be subject to what basically amounts to a pre-judgment of him by virtue of his being thrown out of the United States.

Haiti today is not stable and Haiti today is very poor,

A 41 583 833                    8              December 21, 2000

mlw

    described as the poorest country in the Americas although the
United States and the United Nations both have been expending
efforts to try to build basic social institutions so that the
government itself can actually function.  There has also been a
lot of violence in Haiti over the last several decades, and that
violence is continuing to breed more violence.  "The murder rate
for young men remains high but in the late 1990's the body count
is seldom politically motivated.  Homicide is most often the work
of vigilantes, angry mobs, or criminal gangs.  Persistent
corruption and economic recession have eroded faith in political
leaders."  Exhibit 2F.  The State Department describes Haiti as
being in a "constitutionally irregular situation" throughout last
year.  That means that even at the levels of president it was not
clear whether he or parliament really had constitutional power.
The president dissolved parliament in January leaving the country
without a functioning legislative branch plus eight senators.
New presidential elections were held in December and it is only
now that there is even a chance that the issue about who should
lead the country is settled.  The State Department reports that
the government's human rights record is generally poor and that
its overall effort to respect the human rights of citizens was
marred by serious abuses and shortcomings in oversight.  The
Haitian national police's tendency to resort to excessive force
resulted in a sharp increase in extrajudicial killings.  Police
were linked to several disappearances.  Police continued to beat,

A 41 583 833                          9                    December 21, 2000

mlw

at times torture, and otherwise mistreat detainees.  While some
national police members were fired and incarcerated for human
rights abuses "methodical investigations and prosecutions are
rare and impunity remains a problem."  In addition "poor prison
conditions, arbitrary arrests and detention, and prolonged pre-
trial detention also remained problems."  State Department
Country Report for 1999, Exhibit 2D, pages 1 and 2.

As a deportee from the United States the respondent
will be identified as a group that is talked about in Haiti and
that receives specific treatment as a group in Haiti.  In Exhibit
2H the Immigration Service has given us a report of what happens
when Haitians are deported from the United States.  At page 5 the
report notices that Haiti has actually a very small number of
criminal deportees from the United States, but those deportees
are "still of grave concern to those responsible for public
security" in Haiti.  For instance, since it is still a young
democracy with only a three year old civilian police force and a
"dysfunctional judicial system" that still needs to be
overhauled, Haiti is also overwhelmed by the challenges of drug
trafficking which is a major contributing factor in recent
violence and instability.  The report says that there is a
general perception in Haiti that all criminal deportees from the
U.S. are "killers."  Homicide in fact accounted for only three
out of a total of 202 deportees from the United States in 1998
and half of the crimes were drug-related.  This report says that

A 41 583 833                    10              December 21, 2000

mlw

"while officially deportees are not jailed in any other country in the region, Haitian authorities because of a level of 'insecurity' and contrary to all international rules send the deportees to jail without any regard for their rights." The report says "the history of a group of deportees who arrived on March 24, 1998 is an illustration. On this date the U.S. prisoner transport system returned 38 Haitian citizens to their homeland. When they arrived at the international airport of Port-au-Prince all of them were jailed. The press, the judicial power, the police were invited to attend the 'event.' For four months Alternative Chance (a non-governmental organization) appealed to the Haitian judicial authorities for their release. In spite of an extraordinary process of habeas corpus filed on May 11, 1998, none of them was released." The report goes on to note that these prisoners had already served their prison sentences abroad "making their detention in Haiti illegal" under both Haitian law, Article 5 of the Criminal Instruction Code, and under the International Covenant on Civil and Political Rights, Article 14. Although none of the conditions under which a person can be tried again in Haiti for a crime abroad were met, these 38 prisoners were jailed nonetheless. It was not until mid-July 1998 after four months in custody that they were finally freed and even then "concern about individual liberties is still at stake."

The problem appears to be that there is perception that

A 41 583 833                         11                    December 21, 2000

mlw

is not entirely well grounded that all of those who return to
Haiti are going to contribute to either crime or gang activity in
that country.  In one of the other pieces of evidence submitted
by the Immigration Service titled Haiti Giving Hope a Second
Chance, Exhibit 2F, it is observed that many Haitian criminal
deportees have plea bargained convictions.  Most often they are
for non-violent street level offenses, at page 3, and yet they
are likely to bring shame to the relatives they live with because
"U.S. deportees are regarded as vile thugs in Haiti."  They go on
to say that through a police spokesman Haitian officials
themselves along with the press blame increased violent crime on
U.S. criminal deportees.  See page 6.  In the report it says
"many local officials and some U.S. military personnel I spoke
with claimed U.S. deportees were behind the Haitian gangs," and
indeed statements by the U.S. Government feed the view that since
the people deported from here are unwanted they are likely to
cause problems in Haiti.  According to INS Press Officer Karen
Karusar, 167 people were deported from the U.S. to Haiti in the
first nine months of this year and this number includes some
juveniles who have committed "aggravated felonies, robbery,
drugs," she says, and she is quoted as saying, "I think we can be
glad that we're trying to get them out.  We do not want them in
our country."

The reality appears not to support the view that crime
in Haiti is largely a product of U.S. deportees even though there

A 41 583 833                    12              December 21, 2000

mlw

is a perception that it is.  In reality it appears that most criminal deportees survive on money sent by their families in the States or hang around the airport and hotels hoping either to wash cars for tourists or to serve as English-speaking guides and some do get involved in selling marijuana and others in loan sharking which is common in slums where few people have credit access through banks.  One person deported from the United States earned $200 a day from an American TV network for translation services during the deployment of 23,000 U.S. troops accompanying exiled president Aristide on his return.  This needs to be seen in light of the per capita gross national product of Haiti of $230 a year.  There is talk that the so-called criminal deportees are scapegoats.  One deportee himself who is cited in the article at Exhibit 2F says, "there's a few deportees committing crimes, but they are working for the bigger crooks."  The problem is that gangs have existed in Haiti long before criminal deportees were sent back from the United States.  In the article at 2F a foreign police trainer whose expertise is in organized crime and has had training in investigative operations in both Mexico and Lebanon confirmed the views made by a police inspector Bazill Berthony at the police station in Cite Soleil in Port-au-Prince who was interviewed for the article.  He says, "Base Big Up, our largest gang, existed when I was a child growing up here in the Cite," said the inspector.  He adds that leaders of Haiti's most notorious gangs include corrupt cops drummed out of the newly

mlw

formed Haitian national police and former Ton-ton Macoutes as well as members of criminal families. He said, "during the confusion of the post-Duvalier era criminal gangs began recruiting 12 and 13-year-old youngsters from the slums. We are now in our third generation of these gangs." The foreign police trainer "confirmed Inspector Berthony's assessment" according to the article in saying, "there is neither the critical mass in terms of numbers of U.S. criminal deportees nor the organized gang structures among them to have the kind of significant impact on crime that U.S. gangs are beginning to have in Mexico," he told a reporter. And that same foreign trained police trainer stated that police who have been dismissed from the Haitian national police force are now involved in criminal gangs themselves, and he says that the most significant law enforcement problem in Haiti is corrupt magistrates who for a price grant criminals impunity.

Nonetheless the perception persists that just as the United States is glad to have these people out of the United States Haiti must therefore be terrified to have them there. The emergence of youth gangs is routinely attributed to the burgeoning numbers of U.S. criminal deportees and gang members who arrive in the region each year. According to Exhibit 2F, "frustrated with corrupt and inefficient judicial systems citizens are often willing to accept vigilantism in response to crime and juvenile delinquency." Homicide is most often the work

A 41 583 833                    14                    December 21, 2000

mlw

of vigilantes, angry mobs, or criminal gangs.  Persistent

corruption and economic recession have eroded faith in political

leaders, page 5.

Given by the treatment by the government of Haiti, the

press, the courts, and the general public, it is clear that

deportees from the United States, i.e., those forced out of this

country because of crimes are viewed as people deserving of a

particular kind of treatment.  That treatment includes the

illegal incarceration under color of law for possibly months at a

time.  We haven't mentioned yet that incarceration in Haiti is

something different from incarceration in the United States.  In

the materials submitted by the Immigration Service there are

several pictures of jails, see Exhibit 2F, page 2, and Exhibit

2F, page 6.  The latter shows 40 youths sharing a single cell.

The State Department reports that the prison system is so bad

that at least four deaths during the past year were due to

malnutrition because of food shortages in the prison.  Members of

the security forces continue to violate the provisions of the

constitution prohibiting unnecessary force or restraint,

psychological pressure, or brutality.  Police officers used

excessive and sometimes deadly force in making arrests.  Police

"frequently" beat suspects.  The police mistreatment of suspects

at both the time of arrest and during detention occurs in all

parts of the country.  Beating with fists, sticks, and belts is

by far the most common form of abuse.  Other forms include

A 41 583 833                    15            December 21, 2000

mlw

burning with cigarettes, choking, hooding, and kalot marassa,
severe boxing of the ears which can result in ear drum damage.
Those who reported such abuse often had visible injuries
consistent with the alleged mistreatment.  There were even
isolated allegations of torture by electric shock.  Sometimes
mistreatment took the form of withholding medical treatment from
injured jailed inmates.  Police are rarely prosecuted for the
abuse of detainees.  Arbitrary arrests continues to be a frequent
problem.  The HNP or Haitian National Police ignore provisions
requiring detainees to be brought to a judge within 48 hours.  In
fact this was "disregarded routinely in certain police
jurisdictions."  It is "violated in all parts of the country" and
most flagrantly in certain cities that are listed at page 8.
Authorities even continue to detain persons in defiance of valid
orders for their release issued by judges.  What the State
Department calls the "dysfunctional judicial system" resulted in
pervasive prolonged pre-trial detention with an estimated 80
percent of the country's prisoners awaiting trial.  This problem
is most extreme in Port-au-Prince.  Many prisons were only able
to supply one meal a day to inmates as opposed to two which is
what is required.  A team of physicians who examined 217 inmates
in Port-au-Prince's national penitentiary found that well over
half, 153 of them, were suffering some degree of malnutrition and
that 40 detainees were severely malnourished and not receiving
proper medical care.  The State Department describes prison

A 41 583 833                    16              December 21, 2000

mlw

conditions as very poor, page 7.  They are over-crowded, the
facilities are inadequate, people suffer from inadequate hygiene,
even basic hygiene, poor quality health care, and often to 24
hour confinement to cells.  Some prisons even are short of water.

It is clear from the practice of detaining people like
the respondent upon his return that the respondent will suffer
severe, unjust harm, unjust under Haitian law and unjust under
international law in being confined in inhuman conditions because
he is rejected from the United States.  The Court believes that
the physical nature of the harm including the routine beatings
and other torture as well as the grossly inadequate and life
threatening prison conditions does constitute torture of those
who are returned.  This appears to be the respondent's fate if he
returns and while such a situation exists the United States
should not be returning a person to such circumstances consistent
with our obligations under the Convention Against Torture.

The Court finds also that the group of deportees from
the United States while not large is disproportionately blamed
for some of the greatest evils existing in Haiti.  There are
evils and deportees do have something to do with some of them,
but to paint a picture of the group as a whole as being "killers"
and making a show of their arrival for the press and the courts
and to make it appear that their four month detention is an act
of somehow fighting crime all are prejudicial actions when done
against a group solely on the basis of characteristics attributed

mlw

to the group as a whole rather than specific harm or wrong done

by individual members of the group.  Here the respondent has been

convicted of assault in the second degree.  He has at his young

age experienced a substantial period of confinement and has

learned an important lesson.  The Court does not find that he is

a danger to the community at this point and finds that he has

benefitted from the criminal justice system doing what it was

supposed to do to him in his case.  He has done what he was

supposed to do when subject to the criminal justice system.  To

torture him in inhuman conditions when he returns in violation of

international and Haitian law also constitutes a form of

persecution against him for a characteristic, i.e, being deported

from or rejected from the United States because of crimes that he

cannot change at this point.  In addition that characteristic

will stay with him even if and when he is released.  As noted in

one of the articles, basic civil rights and liberties may be very

difficult.  People who have experienced more time in the United

States than in Haiti in their young lives such as the respondent

walk differently, talk differently, dress differently, and it is

noted in the background materials that they seem to be able to

find each other because they can recognize each other when they

meet.  Such people are in an environment where they are viewed as

a scapegoat for a lot of other problems from institutional ones

to gang violence to drugs that Haiti is experiencing does leave

the people in that category susceptible to the kind of vigilante

mlw

"justice" that is pervasive in Haiti today.  The government seems

not only unwilling to do anything about it but actually promotes

the stereotyping of people expelled from the United States as

criminal elements.  Even the news reports speaking of them speak

of them as "criminal deportees" as a neutral and objective term.

Although that title may reflect the reality that they are

deported because of criminal acts, it is easily interpreted as

attributing to such people a further criminal disposition that

they may well have gotten over as this young respondent did

because of their treatment in the criminal justice system in the

United States.

For this reason the Court believes that the respondent

would also have his life or freedom threatened on account of who

he is, a Haitian who lived in the United States more than half

his life and then was thrown out because of commission of a crime

that is labeled an aggravated felony.

Congress has said that there are circumstances in which

a person's life or freedom may be threatened where we here in the

United States nonetheless have an interest in deporting the

person anyway.  Such cases occur where the person has been

convicted of a particularly serious crime.  At a time in the past

a particularly serious crime included any aggravated felony.

Congress changed its mind about that definition and changed it to

aggravated felonies for which the term of imprisonment is five

years.  The respondent's term of imprisonment was two years.  The

A 41 583 833                    19              December 21, 2000

mlw

Board of Immigration Appeals in <u>Matter of S-S-</u> pointed to the
length of sentence as one of the primary determinants of whether
or not the crime is particularly serious because it is the only
determinant other than the category of aggravated felony to which
Congress pointed in giving a definition of what is particularly
serious.  The respondent received a sentence that was less than
half of what could be apportioned to him and have the crime still
not necessarily be a particularly serious crime.  Obviously as
the time of sentence nears five years by Congress's gauge it is
more serious.  We also are to look at the nature and the
circumstances of the individual crime rather than look at it in
categorical fashion.

In this case the circumstances of the commission of the
crime include violent behavior by a group of young men in which,
though not done by the respondent, the victim was stabbed.  That
is a very serious consideration in judging whether or not he
should be deported even if his life or freedom would be
threatened in his home country.  On the other hand the
circumstances of the crime include his sentence and his treatment
under the sentence.  The respondent was also younger at the time.
He was 20.  He has now spent some of the most precious years of
his youth behind bars.  He has been subject to anger management
course and has not expressed here in this Court bitterness or
anger at what the system has done to him.  On the contrary he
acknowledges that what he had done was wrong, and the Court is

A 41 583 833                    20              December 21, 2000

mlw

not so cynical about the criminal justice system to think that after nearly two years in jail and a long time awaiting deportation proceedings a person will not come to terms with the wrong that he has done.  The Court notes that most of the cases of people who come before it who have committed crimes have committed crimes when they are somewhere between 18 and 25.  They are usually male and they usually haven't finished high school. The respondent had not finished high school.  He is male, and he was young.  He is not destined always to remain the same.  People mature especially through hard experiences, and it appears this respondent has matured through these hard experiences as well. It is not possible on the facts before the Court in this case to say that he continues to be a danger to the community because of his commission of the crime for which he was convicted.  His version of events even was that he was trying to stop the other perpetrators from harming the victim so badly when he saw that there was more involved than just kicking and shoving.  The Court therefore finds that he is not barred to seek withholding of deportation under 241(b)(3) because of commission of what Congress has called a particularly serious crime in the circumstances of this case.


ORDER

IT IS ORDERED that the respondent be deported to Haiti for commission of an aggravated felony subject to the following

A 41 583 833                    21                December 21, 2000

mlw

proviso.

IT IS FURTHER ORDERED that the respondent's deportation to Haiti be withheld under Section 241(b)(3) of the Immigration and Nationality Act.

IT IS FURTHER ORDERED that the respondent's deportation to Haiti be withheld under Article 3 of the Convention Against Torture.


_____
WILLIAM VAN WYKE
Immigration Judge

## CERTIFICATE PAGE

I hereby certify that the attached proceeding before

WILLIAM VAN WYKE in the matter of:

ROBERSON PAUL

A 41 583 833

YORK, PENNSYLVANIA

was held as herein appears, and that this is the original

transcript thereof for the file of the Executive Office for

Immigration Review.

*Mary Lu Wood*
_____
(Mary Lou Wood, Transcriber)

Deposition Services, Inc.
6245 Executive Boulevard
Rockville, Maryland 20852
(301) 881-3344


January 24, 2001
_____
(Completion Date)

U.S. Department of Justice
Executive Office for Immigration Review
Immigration Court


Matter of                                      File No.:  A 41 583 833

                                  )
                                  )
ROBERSON PAUL,                    )          IN REMOVAL PROCEEDINGS
                                  )
        Respondent                )          Transcript of Hearing


Before:   WILLIAM VAN WYKE, Immigration Judge


Date: August 16, 2000                    Place: York, Pennsylvania


Transcribed by DEPOSITION SERVICES, INC. At Rockville, Maryland


Official Interpreter:


Language:


Appearances:

        For the Immigration and        For the Respondent:
        Naturalization Service:

        Maureen C. Gaffney, Esquire    Pro se

Exhibit 5



COPY

**U.S. Department of Justice**
Executive Office for Immigration Review
*Board of Immigration Appeals*

OMB # 1105-0065
**Notice of Appeal to the Board of Immigration**
**Appeals of Decision of Immigration Judge**

---

**1.**  List Name(s) and "A" Number(s) of all Applicant(s)/Respondent(s):

For Official Use Only

    **Roberson PAUL**
    **File Number:  A41 583 833**

    **SERVICE MERITS APPEAL**

    **!**  **WARNING TO ALL APPLICANT(S)/RESPONDENT(S):** Names and "A" Numbers of everyone appealing the order must be written in Item #1.

**2.**  Applicant/Respondent is currently  [X] DETAINED  [ ] NOT DETAINED.

**3.**  Appeal from the Immigration Judge's decision dated December 21, 2000.

**4.**  State in detail the reason(s) for this appeal.  You are not limited to the space provided below; use more sheets of paper if necessary.  Write your name(s) and "A" number(s) on every sheet.

    **!**  **WARNING:**  The failure to specify the factual or legal basis for the appeal may lead to summary dismissal without further notice, unless you give specific details in a timely, separate written brief or statement filed with the Board.

**This is an appeal by the Immigration and Naturalization Service.**

See attached continuation page stating the basis for the appeal.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*FEE EXEMPT\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

(Attach more sheets if necessary)

5. I ☐ do

   ☒ do not

   desire oral argument before the Board of Immigration Appeals.

6. I ☒ will

   ☐ will not

   file a separate written brief or statement in addition to the "Reasons(s) for Appeal" written above or accompanying this form.

> **! WARNING:** Your appeal may be summarily dismissed if you indicate in Item #6 that you will file a separate written brief or statement and, within the time set for filing, you fail to file the brief or statement and do not reasonably explain such failure.

US Immigration and Naturalization Service

| SIGN HERE → | 7. X by *Daryl F. Bloom* | 12·21·00 |
| | Signature of Person Appealing | Date |
| | *(or attorney or representative)* | |

8.

| Mailing Address of Applicant(s)/Respondent(s)/or Attorney |
|---|
| Roberson Paul (INS Detainee) |
| (Name) |
| c/o York County Prison |
| (Street Address) |
| 3400 Concord Road |
| (Apartment or Room Number) |
| York, Pennsylvania 17402 |
| (City, State, Zip Code) |

9.

| Mailing Address of Service Assistant District Counsel |
|---|
| Daryl F. Bloom, Assistant District Counsel |
| (Name) |
| USDOJ/INS/Litigation Unit |
| (Street Address) |
| c/o York County Prison, 3400 Concord Road |
| (Suite or Room Number) |
| York, Pennsylvania 17402 |
| (City, State, Zip Code) |

> **! WARNING:** An attorney or representative will not be recognized as counsel on appeal and will not receive documents or correspondence in connection with the appeal, unless he/she submits a completed Form EOIR-27.

## CERTIFICATE OF SERVICE
### (Must Be Completed)

10.

I    Daryl F. Bloom, Assistant District Counsel    mailed or delivered a copy of this notice of appeal
           (Name)

on    *December 22, 2000*    to    Roberson Paul (INS Detainee)
         (Date)                              (Opposing Party)

at    c/o York County Prison, 3400 Concord Road, York, Pennsylvania 17402
                    (Address of Opposing Party)

| SIGN HERE → | X *Daryl F. Bloom* |
| | Signature of Person Appealing |
| | *(or attorney or representative)* |

**NOTICE OF APPEAL TO THE BOARD OF IMMIGRATION APPEALS**
**OF THE DECISION OF IMMIGRATION JUDGE**
(continuation page)

**File Number: A41 583 833**
**File Name:    Roberson PAUL**

      The Immigration and Naturalization Service hereinafter referred to as the "Service," hereby appeals the decision of the Immigration Judge in York, Pennsylvania, dated December 21, 2000, granting the respondent withholding of removal and withholding of removal under the Convention against Torture pursuant to 8 C.F.R. § 208.16(c). The Immigration Judge's decision is incorrect as a matter of law and fact for the following reasons:

1. The Immigration Judge erred as a matter of law and fact in failing to find that the respondent's conviction for Assault in the Second Degree, where the victim was stabbed in the back during the course of a robbery is a "particularly serious crime," and thus statutorily eligible for withholding of removal and withholding of removal under the Convention Against Torture.

2. The respondent failed to establish a clear probability of persecution, if returned to Haiti, because he is a "criminal deportee."

3. The Immigration Judge erred as a matter of law and fact in finding that "criminal deportees" are a particular social group.

4. The respondent failed to establish that it was more likely than not that he would be tortured if returned to Haiti as a "criminal deportee." The background evidence did not support the respondent's claim that he would be tortured if returned to Haiti.

5. The Immigration Judge erred as a matter of fact in finding the respondent's testimony to be credible.

      Additional issues and grounds for the appeal may be raised after a review of the transcript.

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PAUL ROBERSON,                    :
        Petitioner        :        No. 1:CV-01-1235
                         :
           v.             :        (Judge Rambo)
                         :
IMMIGRATION & NATURALIZATION  :
SERVICE,                          :
        Respondent        :

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that she is an employee in the Office of the United States Attorney for the Middle District of Pennsylvania and is a person of such age and discretion as to be competent to serve papers.

That on this 30th day of July, 2001, she served a copy of the attached

**EXHIBITS IN SUPPORT OF RESPONSE TO HABEAS CORPUS PETITION**

by placing said copy in a postpaid envelope addressed to the person hereinafter named, at the places and addresses stated below, which is the last known addresses, and by depositing said envelope and contents in the United States Mail in Harrisburg, Pennsylvania.

Addressee:

Paul Roberson
  A41-583-833
   59886
York County Prison
3400 Concord Road
York, PA 17402

*Rebecca A Plesic*
_____
REBECCA A. PLESIC
Legal Secretary
United States Attorney's Office

Dated:  July 30, 2001